**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| NOVARTIS VACCINES & DIAGNOSTICS, INC., and NOVARTIS PHARMA AG, <br><br> Plaintiffs, <br><br> v. <br><br> BIOGEN IDEC, INC. and ALEXION PHARMACEUTICALS, INC., <br><br> Defendants. | C.A. No. 11-84-SLR-MPT <br><br> JURY TRIAL DEMANDED <br><br> **REDACTED PUBLIC VERSION** |

## DEFENDANTS' ANSWERING CLAIM CONSTRUCTION BRIEF

Collins J. Seitz, Jr. (Bar No. 2237)
Benjamin J. Schladweiler (Bar No. 4601)
SEITZ ROSS ARONSTAM & MORITZ LLP
100 S. West Street, Suite 400
Wilmington, DE 19801
(302) 576-1600
cseitz@seitzross.com
bschladweiler@seitzross.com

*Of Counsel:*

Donald R. Ware
Claire Laporte
Jeremy A. Younkin
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000
dware@foleyhoag.com
claporte@foleyhoag.com
jyounkin@foleyhoag.com

*Counsel for Defendant Biogen Idec Inc.*


Joseph J. Farnan, III (Bar No. 3945)
Brian E. Farnan (Bar No. 4089)
FARNAN LLP
919 North Market Street
12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com

*Of Counsel:*

Gerald J. Flattmann, Jr.
David M. Conca
Anthony Michael
PAUL, HASTINGS, JANOFSKY & WALKER LLP
Park Avenue Tower
75 E. 55th Street
New York, NY 10022
(212) 318-6000
geraldflattmann@paulhastings.com
davidconca@paulhastings.com
anthonymichael@paulhastings.com

*Counsel for Alexion Pharmaceuticals, Inc.*

Dated: August 9, 2013

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**

## TABLE OF CONTENTS

I. BACKGROUND ................................................................................................... 1

II. THE '688 PATENT ............................................................................................. 4

III. CLAIM CONSTRUCTION .................................................................................. 6

    A. "Vector" (Claims 1, 2, 4, 6, 8, 13, 14) ..................................................... 6

        1. The intrinsic evidence supports Defendants' construction. ........................ 6

        2. The extrinsic evidence supports Defendants' proposed construction. ........ 10

    B. "Improved expression" (Claims 1, 2, 6, 8) ............................................... 13

        1. "Improved expression" is limiting because Novartis relied on it during Prosecution to overcome prior art ............................................................. 14

        2. "Improved expression" is indefinite because the comparator and required level of improvement cannot be determined ............................... 15

        3. Alternatively, "improved expression" means "a 50-100 Fold increase in polypeptide expression as compared to the polypeptide expression from plasmid pSV7d" .............................................................................. 16

    C. "Interposed between the SV40 origin of replication and the SV40 polyadenylation region" (Claims 1, 2, 4, 6, 8) ....................................... 17

    D. "Arranged in the same manner as plasmid pCMV6a" (Claim 14) ........ 20

    E. "Linking together in an operative manner" (Claims 13, 14) ................ 21

    F. "A[n upstream] SV40 origin of replication" (Claims 13, 14) .............. 22

    G. "An isolated nucleic acid molecule" (Claim 17) ................................... 22

    H. "Enhanced promoter" (Claim 17) ......................................................... 24

    I. "The SV40 polyadenylation region comprises the SV40 polyadenylation sequence present in plasmid pSV7d" (Claim 4) ................................... 26

        1. Claim 4 is indefinite ................................................................................ 26

        2. If not indefinite, the term requires the 700 base pair fragment from pSV7d. ..................................................................................................... 29

**ADDENDUM**

SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acumed LLC v. Stryker Corp.*,
  483 F. 3d 800 (Fed. Cir. 2007)......................................................................................12

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003)......................................................................................15

*Biogen Inc. v. Berlex Labs. Inc.*,
  318 F.3d 1132 (Fed. Cir. 2003)........................................................................................7

*Halliburton Energy Servs., Inc. v. M-I LLC*,
  514 F.3d 1244 (Fed. Cir. 2008)................................................................................15, 16

*Hologic, Inc. v. SenoRx, Inc.*,
  639 F.3d 1329 (Fed. Cir. 2011).......................................................................................7

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
  *327 F.3d 1364* (Fed. Cir. 2003*)* ...................................................................................14

*In re O'Farrell*,
  853 F.2d 894 (Fed. Cir. 1988).........................................................................................9

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
  F.3d, 2013 WL 3836240 (Fed. Cir. July 26, 2013)......................................................15

**Statutes**

U.S.C. 35 § 112...............................................................................................................15

**Other Authorities**

*Dictionary of Genetics*, 410 (3d ed. 1985).....................................................................10

*In Vitro*, *Proc. Nat'l Acad. Sci.*, Vol. 70 (November 1973) ...........................................2

*Molecular Biology of the Gene* (4th ed. 1987) ..............................................................10

SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL

## I.      BACKGROUND

This case concerns recombinant DNA technology.  DNA comprises the genetic information for all forms of life.  DNA is organized into structures called "chromosomes" and is made of chemical units known as nucleotides.  Nucleotides specify the sequence of a particular segment of DNA.  Certain DNA sequences, called "genes," encode amino acids.  Amino acids make up proteins, which are also referred to as "polypeptides."

Protein production in cells, referred to as "expression," involves two steps: "transcription" and "translation."  In transcription, the nucleotide sequence of a gene is transcribed (or copied) into RNA inside the cell's nucleus.  This process is directional; the cell's enzymes "read" the DNA sequence from "upstream" to "downstream," (also referred to as 5' to 3' ("five-prime to three-prime")), to create a sequence referred to as an "RNA transcript."

Before the next step – translation – can occur, certain portions of the RNA transcript are cut out by the cell's "splicing" machinery.  The spliced-out portions are referred to as "introns"; the portions of the RNA sequence that remain are referred to as "exons."  The ends of the exons are re-connected after splicing, resulting in an mRNA (messenger RNA) transcript, which is then translated into an amino acid sequence, forming the protein.

The DNA sequences that encode proteins make up only part of an organism's DNA.  Some DNA sequences that do not encode protein information instead contain regulatory signals that govern when, how much, or how fast expression occurs.  Regulatory DNA sequences relevant to this case include "promoters," "enhancers," and "polyadenylation sequences" ("poly(A) sequences").  A promoter is a sequence that permits the initiation of transcription.  An enhancer, as the name suggests, is a region of DNA that enhances (or increases) transcription of genes.  A poly(A) sequence is required for terminating transcription of genes.  Another regulatory DNA relevant to the case is the SV40 origin of replication ("SV40 ori").  This

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**

sequence, taken from a monkey virus – SV40 – permits replication of DNA in certain special cell types.

Scientists discovered, characterized, and manipulated these different types of DNA using tools that enabled them to replicate ("clone") DNA to make large quantities of a particular sequence available for study.  The earliest tools used for this task were referred to as "vectors."  These were DNA constructs that could be used to transfer DNA into a host cell.  Early vectors were most typically plasmids (circular, self-replicating, extrachromosomal DNA molecules commonly found in bacteria) or, in some cases, phages (viruses that infect bacteria and replicate autonomously of the bacterial chromosome).  Both plasmids and phages were natural phenomena that scientists harnessed to advance their research.

Scientists developed plasmid vectors in the early 1970s.  They were aware that many bacteria naturally harbor plasmids in addition to chromosomal DNA.  These plasmids express genes beneficial to the organism.  Using enzymes to cut DNA into fragments, they began to modify naturally occurring plasmids by inserting DNA from other organisms into the plasmids.  Ex. 1, Cohen, et al., "Construction of Biologically Functional Bacterial Plasmids *In Vitro*," *Proc. Nat'l Acad. Sci.*, Vol. 70 (Nov. 1973) at 3240-44.  This development marked the beginning of "recombinant" DNA technology; recombinant DNA is DNA combined from different sources, and a vector containing recombinant DNA is a "recombinant vector."

A recombinant vector, loaded with a DNA of interest, could be inserted into bacterial cells and would replicate independently of the bacterial chromosome.  For example, a bacterial plasmid could be engineered to include a mammalian DNA sequence.  The plasmid carrying the mammalian DNA would then replicate in the host cell, thus creating large numbers of identical DNAs for study.  Ex. 2, Expert Report of Dr. Joseph Sodroski, M.D. ("Sodroski Opening

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**

Report") ¶ 36.  Vectors constructed for replication were typically referred to as "cloning vectors."

In addition to using vectors for replication, scientists also used them for expressing proteins of interest.  Scientists could insert a vector carrying a gene of interest into a cell, which would then operate as a living factory to express protein from the gene of interest.  Vectors constructed for this purpose were termed "expression vectors."  They contained all of the same structures as cloning vectors, along with additional sequences necessary for protein expression.

Scientists expressed proteins using what is known as "transient expression," in which a vector carrying the gene of interest would be inserted into the cell's cytoplasm and remain in the cell as a vector, replicating independently of the cell's chromosome and expressing the protein of interest.  This "transient expression" method permitted protein expression in a short time and was referred to as "transient" because the mammalian cells would lose the vectors during cell division.

Scientists also employed "stable expression": a vector carrying the gene of interest would be inserted into a cell and scientists would further manipulate the cell so that the DNA sequences from the vector would be incorporated into the cell's chromosomal DNA.  Once the DNA sequences delivered by the vector had been incorporated, transforming the cell and creating what is known as a "stable" (or "permanent") cell line, the integrated DNA would replicate as part of the host cell's DNA each time the cell divided.  At the time Novartis filed its patent application in December 1987, it was difficult and time-consuming to establish stably transformed cell lines.

To stimulate production of the protein of interest, scientists assembled regulatory sequences from a variety of sources.  By the early 1980s, scientists had discovered that viruses were a rich source of regulatory DNAs.  Viruses, including SV40 and HCMV, were discovered

3

SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL

to have strong promoters, enhancers, and poly(A) signal sequences that worked well in recombinant plasmids.  A typical recombinant vector for expression of a protein might contain a viral promoter, enhancer, and poly(A) sequence, along with one or more introns and a mammalian protein of interest.

## II.  THE '688 PATENT

The '688 patent belongs to a large family of patents directed to HIV-related research conducted at Chiron Corporation.  The original application in this family was filed in 1984.  The specification of that application focused exclusively on Chiron's HIV research.  Chiron filed numerous continuations-in-part, continuations, and divisional applications.  Until the mid-1990s, all of the claims of these patents were directed to HIV-related research.

On December 24, 1987, Chiron filed a new continuation-in-part adding new material to the specification of the original application to disclose plasmid pCMV6a, which Chiron had used to make an HIV protein, gp120.  The new matter appears in Figure 29 and Example 2.3.2, which is found in columns 27-28 of the specification.  JA00058; JA00074.  Chiron did not seek any claims directed to pCMV6a or any other vector using HCMV regulatory DNA; instead, it pursued claims to a diagnostic test to detect HIV in patients and various recombinant HIV peptides.  Chiron did not seek to patent any aspect of its 1987 disclosure of pCMV6a for over seven years.  In March 1995, Chiron filed an amendment during prosecution of application No. 08/288,336 (the "'336 application") to add twenty new claims based on the 1987 disclosure of pCMV6a.  JA00468-473.  The '336 application ultimately led to the '688 patent, which issued on November 18, 1997.  JA00001.

On April 25, 2006, a third party requested *ex parte* reexamination of the issued claims.  During reexamination, Novartis Vaccines & Diagnostics – the Novartis entity that acquired the '688 patent from Chiron – amended the asserted claims, and the reexamination certificate issued

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**

on December 22, 2009.  JA00100-102.  In this case, Novartis asserts claims 1, 2, 4, 6, 8, 13, 14, and 17.

Plasmid pCMV6a, depicted in Figure 29 of the '688 patent, is shown below.



The DNA fragments in pCVM6a and their order are critical to the claims: an SV40 origin of replication (shown as "SV40 ori"); an enhancer, promoter, and first intron from the HCMV IE1 region (shown as "HCMV IE1 enh/pro" and "HCMV intron"); and an SV40 polyadenylation region (shown as "SV40 polyA").

Although over 100 pages long, the '688 patent contains only a few paragraphs and figures disclosing the subject matter of the patent's claims.  That text discloses that the gene encoding the HIV protein gp120 was inserted into pCMV6a between the HCMV DNA and the SV40 polyA DNA (*i.e.*, at around 5 o'clock in the map shown above) to make plasmid pCMV6ARV120tpa. JA00074.  When plasmid pCMV6ARV120tpa was inserted into specially engineered monkey cells called COS-7 cells, the cells transiently expressed gp120.  *Id.*  As shown above, pCMV6a contained the SV40 ori, a special regulatory signal that interacts with COS-7 cells to rapidly replicate the plasmid.

5

SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL

The specification also states that the level of transient gp120 expression obtained with pCMV6ARV120tpa in COS-7 cells was 50 to 100-fold higher than the amount observed when the same gp120 gene was transiently expressed using a different plasmid called pSV7d.  *Id.* Plasmid pSV7d contained an SV40 enhancer and promoter, instead of the HCMV enhancer, promoter, and first intron used in plasmid pCMV6a.  The '688 patent specification does not disclose any results comparing HCMV-driven expression with and without the intron.  Indeed, the entire patent specification mentions the word "intron" only twice and contains no disclosure of the intron's impact on protein expression.

## III.   CLAIM CONSTRUCTION

### A.      "Vector" (Claims 1, 2, 4, 6, 8, 13, 14) (See Addendum A for claims)

| Defendants' Construction | An extrachromosomal autonomously replicating DNA molecule suitable for transferring foreign DNA into a cell |
|---|---|
| Novartis's Construction | A DNA construct comprising transcriptional and translational initiation and termination regulatory signals and a sequence coding a polypeptide, wherein the regulatory signals are functional in a transformed or transfected host cell and effect expression of the polypeptide |

The dispute between the parties concerning the meaning of "vector" centers on whether a vector is "extrachromosomal" and "autonomously replicating."  Defendants' definition should be adopted because, unlike Novartis's, it is consistent with the specification, the prosecution history, and authoritative references from the mid-1980s.

### 1.      The intrinsic evidence supports Defendants' construction.

The intrinsic record supports Defendants' proposed construction of "vector" as a DNA molecule that is extrachromosomal and autonomously replicating, *i.e.*, DNA that is not integrated into a host cell's genome.

SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL

*The specification.*  The specification does not define the terms "vector" or "vector for expression," although the term "vector" appears frequently.  The specification's only disclosure of the claimed vectors appears in Figure 29 and Example 2.3.2 and concerns transient expression from plasmid pCMV6ARV120tpa and its parent, plasmid pCMV6a.  JA00058; JA00074.  These two plasmids are "extrachromosomal autonomously replicating DNA molecules suitable for transferring foreign DNA into a cell."

The '688 patent contains no disclosure of any HCMV plasmid that involves the integration of HCMV DNA into the chromosome of a host cell.  In fact, the disclosed plasmids (and all of the vector claims) include an origin of replication sequence from SV40, a sequence that enables the plasmids to replicate rapidly and *extrachromosomally* (*i.e.*, transiently) in COS 7 cells – the only cell type employed in Example 2.3.2.  The disclosed and claimed vectors are, in effect, specially engineered for rapid extrachromosomal replication in certain cell types.  As Novartis's expert conceded, these plasmids have no mechanism to promote their own integration into a host cell.  Ex. 3, Sodroski Dep. Tr. at 350:5-7.  Moreover, the only disclosed embodiment is an extrachromosomal, autonomously replicating vector that was used only for transient expression.  Accordingly, this Court should construe the term consistently with Novartis's narrow disclosure.  *See Biogen Inc. v. Berlex Labs. Inc.*, 318 F.3d 1132, 1139 (Fed. Cir. 2003) (limiting claims to single DNA construct and method of transfection; "[w]hen the preferred embodiment is described in the specification as the invention itself, the claims are not necessarily entitled to a scope broader than the embodiment.") (citation omitted); *see also*, *Hologic, Inc. v. SenoRx, Inc.*, 639 F.3d 1329, 1338 (Fed. Cir. 2011) (limiting the construction of a term where "the specification, including the figures, consistently and exclusively" disclose only one embodiment).

Novartis's claim that the specification defines vectors is misleading.  Novartis Opening Claim Construction Brief ("Op. Br.") at 10.  The part of the specification that Novartis relies on simply lists sequences that are necessary for polypeptide expression, over and above the features of an ordinary vector.  The dispute between the parties has nothing to do with these additional features.  The dispute is whether the '688 patent uses the term "vector" to mean chromosomally integrated DNA.  The part of the specification upon which Novartis relies says nothing on that subject.

Novartis also premises its argument on a misstatement of Defendants' position.  Defendants agree that DNA from a vector can integrate into the chromosome of a host cell.  Defendants disagree with Novartis's argument that the DNA, once integrated, is still a "vector" within the meaning of the '688 patent.  One may refer to DNA originating from a vector as "vector DNA" or DNA originating from the HIV virus as "HIV DNA" (as the '688 patent does), but "vector DNA" is no more a "vector" than "goat cheese" is a "goat" or "book learning" is an actual "book."  In all of these cases, a noun – "vector," "goat," or "book" – is used as an adjective (*i.e.,* a noun adjunct) to modify another noun – "DNA," "cheese," or "learning" – by indicating the source of the DNA, cheese, or learning.

When quoting the portion of the specification that is the centerpiece of its argument  (Op. Br. at 10), Novartis adds emphases, not present in the original, that distort the meaning of the text.  The table below shows Novartis's emphasis next to a more natural reading of the specification – a reading that supports Defendants' interpretation.

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**

| Novartis's "spin" on the specification | A more natural reading of the specification |
|---|---|
| Expression vectors may also include the use of regulable promoters, e.g., temperature-sensitive or inducible by chemicals, or ***genes which will allow for <u>integration</u> and amplification of the vector*** and HIV DNA such as tk, dhfr, metallothionein, or the like. | Expression vectors may also include the use of regulable promoters, e.g., temperature-sensitive or inducible by chemicals, or ***genes which will allow for integration and amplification of the vector and HIV DNA*** such as tk, dhfr, metallothionein, or the like. |

In suggesting, through its added emphases, that the sentence is referring only to "integration and amplification of the vector," Novartis leaves the phrase "HIV DNA" hanging. Further, the italicization of "vector" to the exclusion of "and HIV DNA" obscures the way that the word "vector" is used: as an adjective, or noun adjunct, in parallel with "HIV," modifying the word "DNA" and indicating its source.

*The prosecution history.* During prosecution, the applicants repeatedly stated that they were seeking claims to ***plasmids*** – circular, extrachromosomal DNAs – rather than to host cells incorporating integrated DNA originating from a vector. (With respect to "plasmid," *see In re O'Farrell*, 853 F.2d 894, 898-99 (Fed. Cir. 1988) ("A plasmid is a small circular loop of DNA found in bacteria, separate from the chromosome, that replicates like a chromosome.").) When Chiron added the "vector" claims, its patent prosecutor emphasized that the claims were directed to plasmids:

> Information relating to the construction of certain ***plasmids*** for expression of heterologous proteins in mammalian cells have been disclosed in the above-captioned patent application …. Such information includes, for example, the construction of ***plasmid*** pCMV6a, and of its parents and derivatives.

> However, at the time the [1987] CIP application was filed, the emphasis was on identification of DNA sequences obtainable from HIV and the products of expression of such sequences…. The significance of the above-mentioned ***plasmids*** was overlooked.

> On or about August, 1994, Amy L. Collins, a patent attorney employed by the assignee, Chiron Corporation, reviewed the HIV application for the first time and discovered the unclaimed ***plasmids***. Following her review, Dr. Collins

9

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**

> investigated the significance of the ***plasmids*** and inventorship with respect to the ***plasmids*** and made the determination that ***claims to the plasmids*** should be added in a continuation application and the inventorship corrected to reflect the contributions of Steve Rosenberg, Barbara S. Chapman, Richard M. Thayer and Nancy L. Haigwood in designing and making the ***plasmids***.

JA00391 (emphasis added.)  Chiron also submitted a letter from its patent prosecutor to one of

the inventors on the parent patent application.  In the letter, Chiron's lawyer states that "Chiron

wishes to add ***claims directed to the pCMV6a plasmids*** to the above-identified application."

JA00397 (emphasis added.).  Indeed, even during reexamination Novartis continued to equate

the claim term "vector" with pCMV6a.  JA00732 (Nov. 2, 2007 Brief on Appeal at 3) ("the

vector shown in Figure 29").

     Novartis's argument, based on an interpretation of the Subramani reference (Op. Br. at

11), centers on the uncontroversial fact, already discussed above, that DNA originating from a

vector can integrate into chromosomal DNA.  No one is debating that fact.  Novartis's argument

is irrelevant.  Based on the intrinsic evidence discussed above, the Court should adopt

Defendants' construction.

     **2.**     **The extrinsic evidence supports Defendants' proposed construction.**

     Extrinsic evidence confirms Defendants' construction of "vector."  The leading

molecular biology textbook of the mid-1980s, written by James Watson, the Nobel Prize-

winning scientist and co-discoverer of the structure of DNA, defines "vectors" as "autonomously

replicating DNA units into which DNA fragments are inserted for gene cloning."  Ex. 4, Watson

et al., *Molecular Biology of the Gene*, 210 (4th ed. 1987).  A similar definition appears in A

Dictionary of Genetics, which defines "vector" as a "self-replicating DNA molecule that

transfers a DNA segment between host cells."  Ex. 5, King and Stansfield, *A Dictionary of

Genetics*, 410 (3d ed. 1985).  For a vector to replicate autonomously of the cell's chromosome,

as required by these contemporaneous definitions, it must necessarily be extrachromosomal.

SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL

Indeed, the autonomously replicating qualities of vectors were the quality that made them so important during the 1980s: because they replicated autonomously of the cell cycle, they could clone numerous copies of a DNA of interest for study.  Ex. 6, The Rebuttal Expert Report of Michael Levine, Ph.D. ("Levine Rebuttal Report"), ¶ 19.

Novartis's claim construction position is built on evidence that is irrelevant under basic claim construction principles.  Among these items is a 1985 FDA guidance document stamped "Draft."  Kappos Decl., Ex. 8.  There is no evidence that this is a final publication or that it was intended to instruct a person of ordinary skill in the art on the meaning of the term "vector."  Novartis uses misleading ellipses to string together unrelated phrases from this document.  At one point, the document states: "The stability of both the host cell and expression vector should be investigated."  Kappos Decl., Ex. 8 at NVD397098.  Later, in an entirely different paragraph, the Draft Guidance refers to "cases in which there is multiple integration into the host cell genome *of the DNA sequences expressing the protein product*."  *Id*. (emphasis added).  While Novartis would have this Court believe that the thing being "integrat[ed] into the host cell genome" was a "vector," the document in fact described the construct being integrated as "the DNA sequences expressing the protein product."  *Id.*  Neither of the cited sentences supports Novartis's argument.

Novartis also cites an FDA document from 1996, seven years after the relevant filing date of December 1987.  Kappos Decl., Ex. 9.  It is well established that claim terms are to be construed in accordance with "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  *Phillips*, 415 F.3d at 1313.  Accordingly, the 1996 document is not relevant to the

SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL

claim construction inquiry.  Furthermore, this document does not refer to integrated DNA as a "vector."

Novartis also relies on misleading quotations from Defendants' patent applications and testimony.  The patent applications upon which Novartis relies were filed approximately *two decades* after the filing date of the '688 patent.  This Court should not consider these patents because they are from the wrong time period and are entirely unrelated to the '688 patent.  *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 809 (Fed. Cir. 2007) (rejecting reliance on unrelated patent).  Moreover, in contrast to the '688 patent, the Biogen Idec patent applications specifically define "vector."  It is well established that an applicant may act as her own lexicographer and may confer a meaning upon a term that differs from the meaning generally accepted in the art.  *Phillips*, 415 F.3d at 1314.  Indeed, Novartis invoked this very principle in distinguishing the prior art during prosecution of the '688 patent.  JA0068, March 7, 2008 Reply Br. at 5.  When an applicant acts as her own lexicographer, however, any specialized definitions that appear in her patent do not apply to other patents; they are relevant only to the patent in which they appear.

Contrary to Novartis's misstatements (Op. Br. at 12-13), in the cited deposition testimony of Dr. Bebbington, the witness simply confirmed that counsel for Novartis correctly read the words that appear in articles written long after the 1987 filing date of the '688 patent and a patent application.  As Dr. Bebbington repeatedly stated, he was not asked to form an opinion on the meaning of "vector" in the '688 patent, and he did not do so.  Ex. 7, Bebbington Dep. Tr. at 134:8-23.  Novartis's reliance on the testimony of Dr. Rother is equally misplaced.  The witness had not read and was not commenting on the '688 patent or its definition of "vector."  Rather█

████████████████████████████████████████████████████████████████████████

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**

████████       Novartis misleadingly quotes Dr. Levine as saying that nothing in claim 1 indicates whether the claim is limited to transient expression.  In fact, Dr. Levine said that the specific claim element "a nonhuman mammalian host cell expression system for improved expression comprising a nonhuman mammalian host cell" did not specify either stable or transient expression.[1]  Ex. 8, Levine Dep. Tr. at 178:1 – 179:6.  Dr. Gorman, similarly, was simply remarking that the words "stable" and "transient" do not appear in the claim.  Finally, Dr. Haigwood's testimony has nothing to do with the construction of "vector."  Dr. Haigwood's research activities have nothing to do with whether integrated DNA can be called a "vector."

**B.      "Improved expression" (Claims 1, 2, 6, 8)**

| Defendants' Construction | Indefinite |
|---|---|
| Alexion's Alternative Construction | A 50-100 fold increase in polypeptide expression as compared to the polypeptide expression from plasmid pSV7d |
| Novartis's Construction | No construction is required for this term, or plain and ordinary meaning |

The term "improved expression" is in claim 1.  The parties dispute whether this term, added through amendment to overcome prior art during reexamination, is a substantive claim limitation.  Because the term was added to distinguish prior art, it should be regarded as limiting.

The parties also dispute the correct construction of "improved expression."  Defendants' position is that "improved expression" is indefinite or, alternatively, should be construed to mean the degree of improved expression discussed in the patent specification (50-100 times more than

---

[1] Novartis misrepresents Dr. Levine's testimony on the subject of whether vectors are linear or circular.  What Dr. Levine testified was that phage vectors, which have linear genomes, circularize before replication in a host cell.  This is irrelevant to the issue in dispute.  Ex. 8 at 60:20 – 61:9.

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**

the prior art expression system discussed in the patent).  Novartis argues that the term should receive its plain and ordinary meaning, although Novartis does not explain what that is.

### 1. "Improved expression" is limiting because Novartis relied on it during prosecution to overcome prior art

The term "improved expression" is limiting because it was added and repeatedly relied upon during prosecution.  *See, e.g., Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1370 (Fed. Cir. 2003) (finding "improved competence" in preamble limiting, holding "[c]lear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention.").  During reexamination, after claim 1 was rejected based on insufficient written description and in view of the prior art, Novartis amended the claim by adding, among other things, the "improved expression" requirement.  At the time of this amendment, Novartis repeatedly stated that "improved expression" was an aspect of the invention.  JA00917-918, 923-924 (Jan. 22, 2007 Amendment at 8-9, 14-15 ("the inventors clearly conceived of their invention as an improved expression system…."); ("one of skill in the art…would recognize that the inventors were therefore in possession of an improved expression system"); ("even if there were a *prima facie* case of obviousness, the specification rebuts this by demonstrating that the claimed invention produces unexpected results in the form of higher expression.")).  This argument was repeated throughout reexamination.  *See, e.g.*, JA00923-924, January 20, 2007 Amendment at 14-15; JA00870, May 29, 2007 Amendment at 19 (citing improved expression to rebut written description rejection); JA00732, Nov. 2, 2007 Brief on Appeal at 3 ("The claimed subject matter is directed to a non-human mammalian host cell expression system for improved expression of a polypeptide.").

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**

By explicitly arguing that "improved expression" made its claims patentable, Novartis embraced the fact that its preamble is limiting.

### 2.   "Improved expression" is indefinite because the comparator and required level of improvement cannot be determined

Although limiting, the term "improved expression" is indefinite because it is "insolubly ambiguous," meaning that "a person of ordinary skill in the art could not determine the bounds of the claims." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, --- F.3d ----, 2013 WL 3836240 at *2 (Fed. Cir. July 26, 2013); *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008). The definiteness requirement, articulated in 35 U.S.C. § 112 ¶ 2, ensures that patent claims will be "sufficiently precise to permit a potential competitor to determine whether or not he is infringing." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1342 (Fed. Cir. 2003).

There is no stated definition of "improved expression" in the patent specification. Indeed, the specification nowhere discusses "improved expression" other than in connection with a single experiment where HIV polypeptide gp120 is expressed transiently using the claimed plasmid at a level 50-100 times over a prior art transient expression experiment using plasmid pSV7d. JA00074, col. 28, lines 5-16. Because the patent's specification discloses only this single example, a person of ordinary skill in the art has no reasonable way to determine what level of expression constitutes "improved expression" or what comparator should be used to determine whether a given expression level is indeed "improved," as the claims require. Notably, the specification does not present any data comparing the claimed vectors, which include an HCMV intron, to vectors that have all of the same components except the intron.

Novartis's own expert, Dr. Sodroski, agreed that no one "can put a value on [increased expression] because it's very context-dependent." Ex. 9, Sodroski Dep. Tr. at 37:15-38:2. He

SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL

also testified that "[i]t depends on the gene and polypeptide that is being encoded, the types of

cells that one wants to produce the protein in, and the ease of ultimately purifying the expressed

protein. … So it's not possible to say, to put a specific number on what improved expression

means …." *Id.* at 38:18-21.  Dr. Sodroski also could not identify what comparator should be

used in the context-dependent exercise of determining whether "improved expression" has been

achieved.  He testified that "improved expression" is "not limited to a specific amount of

improvement, nor does it require a specific comparator." *Id*. at 18-19.  *Halliburton*, 514 F.3d at

1255 ("When a proposed construction requires that an artisan make a separate infringement

determination for every set of circumstances in which the composition may be used, and when

such determinations are likely to result in differing outcomes (sometimes infringing, sometimes

not), that construction is likely to be indefinite.").

Novartis's proffered "plain and ordinary meaning" does nothing to resolve the ambiguity

of the claim because the skilled artisan cannot discern what that meaning is, as Dr. Sodroski's

testimony demonstrates.

### 3. Alternatively, "improved expression" means "a 50-100 Fold increase in polypeptide expression as compared to the polypeptide expression from plasmid pSV7d"

If the Court finds that "improved expression" is not indefinite, then the only definition

that could apply is "a 50-100 fold increase in polypeptide expression as compared to the

polypeptide expression from plasmid pSV7d" because this is the only construction that is

consistent with the specification and prosecution history.

As discussed above, the specification discloses only this 50 to 100-fold improvement

compared with pSV7d.  During prosecution, Novartis repeatedly relied on this specific result.

*See* JA00505 (Oct. 25, 1995 Amendment at p. 13 ("the inclusion of the subject intron in a

mammalian expression vector … was shown to provide a significant increase (*e.g.*, a 50-100 fold

16

SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL

increase) in the expression of gp120 polypeptide relative to an SV40-based expression system.");

*see also* JA00555 (Oct. 29, 1996 Amendment at 8).  During reexamination, Novartis again touted

the 50 to 100-fold increase in expression over pSV7d to overcome prior art rejections.  JA00923

(Jan. 22, 2007 Amendment at 14).

Accordingly, the Court should find that "improved expression" is a limitation.  If it is not

indefinite, then it means "a 50-100 fold increase in polypeptide expression as compared to the

polypeptide expression from plasmid pSV7d."

### C.     "Interposed between the SV40 origin of replication and the SV40 polyadenylation region" (Claims 1, 2, 4, 6, 8)

| Defendants' Construction | Placed downstream of the SV40 origin of replication and upstream of the SV40 polyadenylation region, with no intervening SV40 origin of replication or SV40 polyadenylation region. |
|---|---|
| Novartis's Construction | Placed between an upstream SV40 origin of replication and a downstream SV40 polyadenylation region |

The term "interposed between the SV40 origin of replication and the SV40

polyadenylation region" appears in independent claims 1 and its dependents and 4, which was

originally a dependent claim from  claim 1.  These claims require that a transcription regulatory

region from HCMV be "interposed between" "an upstream SV40 origin of replication" and a

"downstream SV40 polyadenylation region."   The dispute is whether the HCMV is "interposed

between" these two elements even when other SV40 sequences intervene and change the

functional relationship of the recited elements.

Initially, during prosecution, claim 1 did not contain the "interposed between" limitation.

The Examiner rejected it as indefinite because "the arrangement of the elements in relation to

each other is unclear."  JA00478 (June 15, 1995 Office Action at 2).  To overcome this rejection,

Novartis added the qualifiers "upstream" and "downstream" to the descriptions of the SV40 ori

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**

and poly(A) sequences and also added the limitation that the HCMV was "interposed between" these two elements.  Novartis explained that the purpose of these amendments was "to recite the relative arrangement of the elements in the polynucleotide sequence" and cited Figure 29 as support for its amendment.  JA00499 (Oct. 16, 1995 Amendment at 7).  As a result, the Examiner withdrew the indefiniteness rejection.  JA00534-535 (Apr. 24, 1996 Office Action at 2-3).  This amendment narrowed the scope of the claims to require a specific relative arrangement of the recited elements: (1) SV40 origin of replication, (2) HCMV transcription regulatory region, and (3) SV40 polyadenylation region.  Any proper claim interpretation must account for the applicants' surrender of vectors with a different ordering of elements.

Defendants' construction is also supported by the specification.  Figure 29, JA00058, the only disclosed embodiment, is reproduced above on p. 5 and shows a specific arrangement of the claimed elements: (1) SV40 origin of replication, (2) HCMV IE regulatory region (the region encompassing the "HCMV IE1 enh/pro" and "HCMV intron"), and (3) SV40 polyadenylation sequence.  These three elements, ordered 1 – 2 – 3, form a single transcription unit.  A transcription unit is a group of sequences that work together to transcribe a gene.

Under Novartis's proposed interpretation, the recited elements can be present ***anywhere*** in a plasmid, even if other functional sequences intervene.  Indeed, Novartis's expert could not articulate any situation in which an element on a plasmid was not "interposed" between any two other elements.  As he candidly admitted, "on a circular plasmid, any three points, one point is going to be interposed between any two other points regardless of where they are on the plasmid."  Ex. 9, Sodroski Dep. Tr. 196:7-10. Novartis's proposed construction would render the claim language meaningless and cannot be squared with the file history or specification.

SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL

Novartis seeks a construction in which "interposed" does not limit the arrangement of the recited DNA sequences because Defendants' cell lines are structured entirely differently from pCMV6a. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████ Ex.

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████ Novartis should not be allowed to reclaim now exactly what it surrendered when it amended its claims and argued that the reason for that amendment was "to recite the relative arrangement of the elements of the polynucleotide sequence."

Novartis's additional argument that defendants have erred concerning the relationship between "upstream" and "downstream" with respect to the HCMV transcription regulatory region is refuted by its own expert, who agreed that the concepts of "upstream" and "downstream" were transitive, so that if A is upstream of B, B is downstream of A.  Ex. 9, at 171:8-19.  Further, Novartis's arguments concerning the possible bi-directionality of the SV40 origin of replication and polyadenylation regions cannot cure its improper attempt to recapture subject matter relinquished during prosecution.

SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL

### D.      "Arranged in the same manner as plasmid pCMV6a" (Claim 14)

| Defendants' Construction | Arranged in the same order and orientation as in the plasmid pCMV6a, with no additional intervening SV40 origin of replication, HCMV, or SV40 polyadenylation sequences |
|---|---|
| Novartis's Construction | The SV40 ori, transcription regulatory region, and SV40 polyadenylation region arranged in the same order as in the plasmid pCMV6a |

The dispute concerning claim 14's "arranged in the same manner as plasmid pCMV6a" overlaps with the dispute concerning claim 1's "interposed between" limitation, and Defendants incorporate their arguments concerning the arrangement of elements here.  There are also two additional areas of dispute.  The first is whether this claim covers anything other than a circular plasmid, given this claim's explicit requirement that the elements be "arranged in the same manner as *plasmid* pCMV6a."  Only another circular plasmid could feature the same arrangement as plasmid pCMV6a.

The second dispute is whether, as Defendants contend, the SV40 origin of replication element must be oriented in the direction shown in plasmid pCMV6a: *i.e.*, opposite the orientation of the other recited elements.  As shown below, Defendants' interpretation is correct.

Figure 29 is the only place in the specification that shows the configuration of plasmid pCMV6a.  The figure depicts pCMV6a as including an SV40 ori oriented in a counterclockwise direction (indicated by the arrow), an HCMV transcription regulatory region oriented in a clockwise direction directly adjacent to and downstream of the SV40 ori, and an SV40 poly(A) oriented in a clockwise direction.  The orientation of the SV40 ori is counter to the other elements in Figure 29, which is the only disclosure of pCVM6a in the patent and thus must be dispositive of the meaning of "arranged in the same manner as plasmid pCMV6a."

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**

Moreover, "arranged in the same manner as plasmid pCMV6a" was added to claim 14 during the original prosecution in order to overcome an indefiniteness rejection.  JA00500 (October 25, 1995 Amendment at 8 (discussing claim 77)).  Once this narrowing limitation was added to claim 14, the claim was allowed in amended form.  JA00560-562 (January 8, 1997 Notice of Allowability).  Novartis cannot reclaim the generality that it disclaimed during prosecution.  The Court should adopt Defendants' definition of "arranged in the same manner as plasmid pCMV6a."

### E.   "Linking together in an operative manner" (Claims 13, 14)

| Defendants' Construction | Linking the recited elements so that each element operates |
|---|---|
| Novartis's Construction | The recited elements are arranged so that the heterologous polypeptide, a mammalian polypeptide, or a mammalian virus polypeptide is expressed |

The parties' disagreement on the meaning of this term is applicable only to claim 13 and its dependent claim 14.  Unlike all the other claims, these two claims require all four recited DNA sequences— SV40 ori; SV40 polyA; HCMV DNA; and polypeptide coding region—to be "link[ed] together in an operative manner."  This requirement in these two claims is in addition to the requirement in all claims (the meaning of which is not disputed by the parties), that the HCMV DNA be "operably linked" to the polypeptide coding sequence.

The meaning arises straightforwardly from the claim language itself: all four of the recited pieces must be linked so that each operates.

Novartis seeks to read this language right out of the claim.  In Novartis's view, the claim is satisfied as long as a polypeptide is expressed.  But a polypeptide can be expressed even if each of the recited elements is not "link[ed] together in an operative manner."  For example, a polypeptide can be expressed with a promoter and the polypeptide sequences alone.  Novartis

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**

articulates no interpretation of this claim element that does not render it superfluous to the term "operably linked," which appears in the same claims.  Novartis's proposal should be rejected.

### F.     "A[n upstream] SV40 origin of replication" (Claims 13, 14)

| Alexion's Construction | A functioning SV40 origin of replication |
|---|---|
| Novartis's Construction | A region of DNA that originates from simian virus 40 and is a signal for initiation of replication of DNA |

Alexion proposes that the term "a[n upstream] SV40 origin of replication" means "a functioning [upstream] SV40 origin of replication."  Novartis proposes that the term be construed as "a region of DNA that originates from simian virus 40 and is a signal for initiation of replication of DNA."  The dispute between the parties is whether the claimed sequence must merely be present or whether it must be functioning as an origin of replication.

Alexion's construction is supported by the lone embodiment in the '688 patent specification, Example 2.3.2, which, as discussed above, is a transiently transfected plasmid expression vector compared with another transiently transfected plasmid expression vector.  Because the plasmids used in that example both contain SV40 origins of replication, which function to replicate the plasmid in those transient systems, but do not function to replicate when integrated, the '688 patent specification recognizes that the claimed SV40 origin of replication must be functioning as an origin of replication.  Otherwise, the claim language is superfluous.  Accordingly, the Court should construe "a[n upstream] SV40 origin of replication" to mean functioning as an origin of replication.

### G.     "An isolated nucleic acid molecule" (Claim 17)

| Defendants' Construction | A nucleic acid molecule separate from all other DNA |
|---|---|
| Novartis's Construction | A segment of DNA nucleotides existing separate from other hCMV components normally associated with HCMV |

SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL

The dispute between the parties concerning "isolated nucleic acid molecule" centers on whether the term "isolated" means separate from all other DNA, as Defendants contend, or integrated into a host cell chromosome, as Novartis's definition would permit.  Novartis's proposed construction is designed to set up its infringement argument that a segment of DNA integrated into Defendants' cell lines constitutes "an isolated DNA molecule."  The Court should adopt Defendants' interpretation, which is the only one consistent with the intrinsic evidence and the scientific meaning of the term "molecule."

The specification of the '688 patent describes "isolating" DNA to indicate that it has been separated from **all** other DNA.  Once separated, it can then be joined to other fragments.

> In *isolating* the different domains the provirus may be digested with restriction endonucleases, the fragments electrophoresed and fragments having the proper size and duplexing with a probe, when available, are *isolated*, cloned in a cloning vector, and excised from the vector.  JA00065, col. 9, lines 50-54. (emphasis added)
>
> * * *
>
> To construct plasmid pBS24.1/SOD-Sf2env4-5 a 1.2 kbp BglII-SalI fragment which corresponds to nucleotides 6603-7795 (see FIG. 3) was *isolated* from pSV7dARV160T-tpa and ligated into pBS24/SODSF2env4 (see Section 4.2.4.3.) which had previously been digested with BglII and SalI.  JA00084, col. 48, lines 38-42.  (emphasis added)

The scientific meaning of "isolated nucleic acid molecule" confirms the correctness of Defendants' proposed construction.  A "molecule" is a group of atoms held together by covalent bonds.  When one DNA molecule is covalently bonded to another, they form an entirely new molecule.  A length of DNA that is covalently bonded to and part of a larger DNA molecule such as a chromosome is not an "*isolated* nucleic acid molecule," because it is not either "isolated" or a "molecule."  Ex. 6, at ¶¶ 76-77.  It does not make scientific sense to refer to a portion of DNA integrated into the chromosomal DNA as "an isolated nucleic acid molecule."  Novartis's proposed construction would permit Novartis to argue that the integrated segment of DNA

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**

(shown in magenta) in Novartis's graphic copied below is actually "isolated," while the graphic demonstrates that it is anything but.



Novartis's criticism of Defendants' construction as "internally inconsistent" is premised on a misunderstanding of Defendants' position.  The claim requires an "isolated nucleic acid molecule" that includes two parts: HCMV DNA and a polypeptide coding sequence.  Ex. 3, at 315:4-14.  Those two components must make up a "molecule" that is "isolated" from other items.  Such a construction is entirely consistent with the plain language of the claim and has no internal inconsistency.  Novartis's argument is erroneously premised on the notion that Defendants are arguing that only the HCMV DNA must be "isolated," but Defendants have never taken that position.  Ex. 6, at ¶ 80.

Novartis's proposed construction should be rejected.  Nothing in the specification or file history suggests that the term "isolated" has anything to do with "other HCMV components normally associated with HCMV."  Indeed, it is unclear what "other HCMV components normally associated with HCMV" even means, and Novartis provides no explanation.

H.      **"Enhanced promoter" (Claim 17)**

| Defendants' Construction | Indefinite |
|---|---|
| Novartis's Construction | A promoter comprising the hCMV IE1 promoter and the 1st intron proximate to the 3' end of the hCMV IE1 promoter |

The specification makes no mention of the term "enhanced promoter," which appears only in asserted claim 17.  "Enhanced promoter" is not a term of art that would be known to a

skilled artisan (*see* Ex. 10, The Expert Report of Michael Levine, Ph.D., ("Levine Opening Report"), at ¶ 56).  The claim language states only that the "enhanced promoter" "comprises the human cytomegalovirus immediate early region HCMV IE1 promoter and the first intron proximate to the 3' end of the HCMV IE1 promoter …."  Because the enhanced promoter "comprises" the two elements upon which Novartis relies – meaning that it could include more – those elements do not define the term or provide any meaning to the skilled artisan.

The '688 patent was filed following the discovery, recent at the time, that HCMV contained a powerful enhancer sequence upstream of the HCMV IE promoter and intron.   Ex. 11, Boshart et al., "A Very Strong Enhancer is Located Upstream of the Immediate Early Gene of Human  Cytomegalovirus," *Cell*, Vol. 41 (June 1985): 521-530.  ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████  Thus, the term "enhanced promoter" is plausibly interpreted as requiring the inclusion of enhancer sequences upstream of the HCMV promoter.

Perhaps equally plausible is Novartis's proposed construction, in which the term could refer to the promoter being enhanced only because of the inclusion of the first intron.  Ex. 13, Sodroski Rebuttal Report ¶ 274.)  Because nothing in the claim itself, the specification, or the file history provides any guidance as to whether upstream enhancer sequences are required to have an "enhanced promoter," the claim is indefinite.

SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL

### I.   "The SV40 polyadenylation region comprises the SV40 polyadenylation sequence present in plasmid pSV7d" (Claim 4)

| Defendants' Construction | Indefinite |
|---|---|
| Alexion's Alternative Construction | The 700 bp PvuI-SalI SV40 polyadenylation sequence from plasmid pSV7d |
| Novartis's Construction | A region of DNA that originates from simian virus 40 and serves as a signal for cleavage and addition of multiple adenines to the transcript |
| | Plain and ordinary meaning for the rest |

#### 1.   Claim 4 is indefinite

The term "the SV40 polyadenylation sequence present in plasmid pSV7d" is indefinite.

Most of the claims of the '688 patent simply require an SV40 polyadenylation region. Claim 4 is the only claim that specifies that this region must include the sequence present in a specific plasmid, pSV7d.  JA00101.  Thus, a correct construction of this term should be the exact DNA sequence present in the specified plasmid.  The prosecution history confirms this analysis. Novartis tried to claim sequences that were merely "homologous" to pSV7d during prosecution, but the Examiner forced the applicants to drop that ambivalent qualifier.  JA00537-538.

It is undisputed that the required sequence is not disclosed in the specification of the '688 patent and that pSV7d was not deposited to permit public access to it.  The specification states that pCMV6a contains "the SV40 polyadenylation region derived from pSV7d … as a 700 [base-pair] PvuI-SalI fragment." JA00074, col. 28, lines 20-36.  Elsewhere in the patent, the inventors trace the origin of the SV40 polyadenylation region in pSV7d from a "240 bp SV40 fragment containing SV40 poly A addition sites … [Subramani et al. (1981) J. Mol. Cell. Biol. 1: 854-864] …."  JA00074, col. 21, lines 48-50 (brackets in original).  Novartis's expert confirmed that the cited Subramani reference provides no information concerning the sequence.  Ex. 3, at 306:2-24.

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**

Because the specification yields no information concerning the sequence, Defendants sought the information in interrogatories. ██████████████████████████

████████████████████████████████

██████████████████████████████████

██████████████████████████████

██████████████████████████████████

████████████████████████████████

███████████████████████████████

███████

████████████████████

██████████████████

██████████████

███████████████████████
██████████████

████████████████████████████

█████████████████████████████

████████████

Novartis's expert Dr. Sodroski could not clear up the confusion over the length and content of the sequence.  In his initial expert report, he contended that, for purposes of infringement, this claim required only a 45 base-pair "minimal" sequence for the SV40 polyadenylation region found in a particular published reference.  ████████████████

██████████████████████████████ Elsewhere in the same report, he pared this down to a 41-bp sequence.  *Id*. at ¶¶ 265, 302.  In attempting to

27

SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL

fend off the prior art in his subsequent report, however, he contended that this element required a 163 base-pair fragment.  Ex. 13, at ¶ 114.)

Novartis proposes that the term should be accorded its plain and ordinary meaning. However, it appears that what Novartis actually means by this is Dr. Sodroski's 163-bp contention.  Novartis has settled upon this contention, ███████████████████████ ███████████████████████████████████████████████████████ ████████  In its opening brief, Novartis states, noncommittally, that "the SV40 polyadenylation sequence present in plasmid pSV7d" requires "*about* 163 base pairs" of SV40 DNA from deposited plasmids pSV7c *or* pCMV6ARV120tpa.  According to Novartis, the 163 base pairs to which it points constitute "the minimum polyadenylation sequence contained within the 700 bp fragment" that is cited in the specification.  Op. Br. at 20.

Novartis's proposed 163-base pair construction cannot be correct.  Nothing in the claim language suggests that a "minimum" functional sequence is all that is required.  The claim requires the sequence "present in plasmid pSV7d," a sequence Novartis has failed to identify in interrogatory answers, expert reports, or depositions.

It is undisputed that Novartis never deposited pSV7d, the plasmid actually referenced in claim 4.  The actually deposited plasmids pSV7c and pCMV6ARV120tpa cannot rescue claim 4 from indefiniteness because they are not pSV7d.  Further, Novartis has not disclosed the DNA sequence of the SV40 polyA region of pSV7c or pCMV6ARV120tpa, and ███████████ ████████████████████████████████████████████████████████████ ██████████████████████████████

Further, the reference to the deposits does not address a gaping hole in the construction of this term: the need to establish the number of base pairs of DNA that are actually required to

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**

meet this element.  Is it 700, as set forth in the specification?  240, as set forth in Novartis's

sworn interrogatory responses?  214, as set forth in the Truett reference?  163, as set forth in Dr.

Sodroski's second report?  45, as set forth in Dr. Sodroski's first report?  41, as also set forth in

Dr. Sodroski's first report?  Novartis's ultimate choice of 163 base pairs of "minimum" sequence

is plainly an effort to pare the required, but unknown, sequence down to one that it believes is

likely to match Defendants' sequences and yet not be present in the prior art.

In its brief, Novartis papers over its result-oriented manipulation of the possibilities by

contending that the phrase "the SV40 polyadenylation sequence present in plasmid pSV7d"

should be accorded its "plain and ordinary meaning."  This highly technical term does not have a

plain meaning and would be incomprehensible to a lay jury.  Given the thicket of conflicting

alternative sequences discussed above, this proposal should be summarily dismissed.

### 2.    If not indefinite, the term requires the 700 base pair fragment from pSV7d.

If the Court finds that "the SV40 polyadenylation sequence present in plasmid pSV7d" is

not indefinite, then the only definition that could apply is "the 700 bp PvuI-SalI SV40

polyadenylation sequence from plasmid pSV7d."

First, the only description of the claimed polyadenylation sequence in the patent

specification states that "[t]he [pCMV6a] plasmid contains the SV40 polyadenylation region

derived from pSV7d (Section 2.2.1.) as a 700 bp PvuI-SalI fragment."  Second, during

reexamination, the Examiner stated that claim 4 was "patentable over the Spaete reference and

the prior art of record since there are no references of record which disclose or suggest the

modification of the Spaete vector to incorporate the exact nucleotide sequences present in the

700 bp PvuI-SalI fragment of pSVT2 [sic:pSV7d]."  JA00946-947 (Nov. 21, 2006 Office Action

at 13-14).  Thus, the Examiner explicitly relied on the exact 700-nucleotide sequence described

**SUBJECT TO PROTECTIVE ORDER – HIGHLY CONFIDENTIAL**

in the patent specification when he allowed claim 4 to issue.  This explicit definition prevents

Novartis from arguing that this term requires only a 163 base-pair sequence that it now declares

is the "minimum."   Because Novartis's definition has no support in the specification or file

history, this Court should reject it and adopt Alexion's proposed "700 bp PvuI-SalI SV40

polyadenylation sequence from plasmid pSV7d."

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
</table>

SEITZ ROSS ARONSTAM & MORITZ LLP

FARNAN LLP

/s/ Benjamin J. Schladweiler

Collins J. Seitz, Jr. (Bar No. 2237)
Benjamin J. Schladweiler (Bar No. 4601)
100 S. West Street, Suite 400
Wilmington, DE  19801
(302) 576-1600
cseitz@seitzross.com
bschladweiler@seitzross.com

/s/ Brian E. Farnan

Joseph J. Farnan, III (Bar No. 3945)
Brian E. Farnan (Bar No. 4089)
919 North Market Street
12th Floor
Wilmington, DE  19801
(302) 777-0300
bfarnan@farnanlaw.com

Of Counsel:

Donald R. Ware
Claire Laporte
Jeremy A. Younkin
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA  02210
(617) 832-1000
dware@foleyhoag.com
claporte@foleyhoag.com
jyounkin@foleyhoag.com

Counsel for Defendant Biogen Idec Inc.

Of Counsel:

Gerald J. Flattmann, Jr.
David M. Conca
Anthony Michael
PAUL, HASTINGS, JANOFSKY & WALKER LLP
Park Avenue Tower
75 E. 55th Street
New York, NY  10022
(212) 318-6000
geraldflattmann@paulhastings.com
davidconca@paulhastings.com
anthonymichael@paulhastings.com

Counsel for Alexion Pharmaceuticals, Inc.

Dated:  August 9, 2013

## <u>CERTIFICATE OF SERVICE</u>

I, Benjamin J. Schladweiler, hereby certify that on August 9, 2013, I caused the foregoing

***Defendants' Answering Claim Construction Brief*** to be served via electronic mail upon the

following individuals:

Richard K. Herrmann
Mary B. Matterer
Kenneth L. Dorsney
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
rherrmann@morrisjames.com
mmatterer@morrisjames.com
 kdorsney@morrisjames.com

*Counsel for Novartis Vaccines and*
*Diagnostics Inc.*

John C. Kappos
Bo K. Moon
Diane K. Pang
Michael L. Myers
Nicholas B. Janda
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA  92660
jkappos@omm.com
bmoon@omm.com
dpang@omm.com
mmyers@omm.com
njanda@omm.com

George A. Riley
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA  94111
 griley@omm.com

Andrew Kumamoto
Don F. Kumamoto
Cora L. Schmid
HELIXIP LLP
303 Twin Dolphin Drive, 6th Floor
Redwood City, CA  94065
(650) 474-0240
akurnamoto@helixip.com
dfkumamoto@helixip.com
cschmid@helixip.com

*Counsel for Novartis Vaccines and*
*Diagnostics Inc.*

Steven J. Balick
Andrew Colin Mayo
Tiffany Geyer Lydon
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
Wilmington, DE  19801
sbalick@ashby-geddes.com
amayo@ashby-geddes.com
tlydon@ashby-geddes.com

*Counsel for Novartis Pharma AG*

Thomas P. Steindler
Charles J. Hawkins
Raymond M. Gabriel
MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, N.W.
Washington, D.C.  20001
tsteindler@mwe.com
chawkins@mwe.com
rgabriel@mwe.com

Katherine Nicole Clouse, Ph.D.
MCDERMOTT WILL & EMERY LLP
28 State Street
Boston, MA  02109-1175
nclouse@mwe.com

*Counsel for Novartis Pharma AG*

 */s/ Benjamin J. Schladweiler*          
Benjamin J. Schladweiler (Bar No. 4601)

2

# ADDENDUM

1. A *non-human mammalian host cell expression system for improved expression comprising a non-human mammalian host cell with a* vector for expression of a polypeptide in a mammalian cell comprising a first polynucleotide sequence that comprises:

    a) an upstream SV40 origin of replication;

    b) a downstream SV40 polyadenylation region; [and]

    c) a transcription regulatory region from human cytomegalovirus immediate early region HCMV IE1, wherein the transcription regulatory region includes the first HCMV IE1 intron proximal to the 3' end of the HCMV IE1 promoter, is interposed between the SV40 origin of replication and the SV40 polyadenylation region, and is capable of directing the transcription of a polypeptide coding sequence operably linked downstream from the transcription regulatory region, *and*

    d) *the polypeptide coding sequence encoding a heterologous polypeptide operably linked downstream of the transcription regulatory region.*

2. The [vector] *non-human mammalian host cell expression system* of claim 1, wherein the polynucleotide sequence further comprises a linker that comprises a restriction site for insertion of the coding region of a polypeptide.

4. [The vector of claim 1] *A vector for expression of a polypeptide in a mammalian cell comprising a first polynucleotide sequence that comprises:*

    a) *an upstream SV40 origin of replication;*

    b) *a downstream SV40 polyadenylation region; and*

    c) *a transcription regulatory region from human cytomegalovirus immediate early region HCMV IE1 wherein the transcription regulatory region includes the first HCMV IE1 intron proximal to the 3' end of the HCMV IE1 promoter is interposed between the SV40 origin of replication and the SV40 polyadenylation region, and is capable of directing the transcription of a polypeptide coding sequence operably linked downstream from the transcription regulatory region,* wherein the SV40 polyadenylation region comprises the SV40 polyadenylation sequence present in plasmid pSV7d.

6. The [vector] *non-human mammalian host cell expression system* of claim 1, further comprising a selectable marker.

8. The [vector] *non-human mammalian host cell expression system* of claim 1, further comprising a bacterial origin of replication.

13. A vector produced by the process comprising linking together in an operative manner:
a) a SV40 origin of replication;
b) a SV40 polyadenylation region; [and]
c) a transcription regulatory region from human cytomegalovirus immediate early region HCMV IE1 wherein said regulatory region includes the first HCMV IE1 intron proximal to the 3' end of the HCMV IE1 promoter and is capable of directing the transcription of a *mammalian polypeptide or a mammalian virus* polypeptide coding sequence operably linked downstream therefrom*; and*
 d) *the polypeptide coding sequence encoding a mammalian polypeptide or a heterologous mammalian virus polypeptide operably linked downstream of the transcription regulatory region.*

14. The vector of claim 13, wherein the vector is arranged in the same manner as plasmid pCMV6a.

17. An isolated nucleic acid molecule comprising an enhanced promoter, wherein the enhanced promoter comprises the human cytomegalovirus immediate early region HCMV IE1 promoter and the first intron proximate to the 3' end of the HCMV IE1 promoter *and wherein the enhanced promoter is operably linked to a nucleic acid sequence encoding a mammalian polypeptide or a heterologous mammalian virus polypeptide.*